## SCOPE OF EMPLOYMENT OF CHAUFFEURS.

Common Pleas Court of Cuyahoga County.

SARAH E. WHITFORD v. CHARLES J. STEWART.

Decided, July 10, 1914.

*Woman Struck by Automobile While Alighting from Street Car—Gross Negligence to Drive Between a Car Discharging Passengers and the Curb—Regardless of the Validity of a Prohibitory Ordinance— Unauthorized Detour of a Mile Does Not Take a Chauffeur Out of the Scope of His Employment, When—Intention of Chauffeur and Extent of the Detour Determining Factors—Tendency to Broaden the Liability of Employers Placing in the Hands of Employees Appliances Capable of Great Injury if Negligently Handled—A Chauffeur Not an Agent But Often in the Class of Domestic Servants.*

1. The traffic regulation which in many cities has taken the form of an ordinance, that a vehicle following a street car must stop when the car stops to take on or discharge passengers, has become an established custom which passengers have a right to assume will be observed and which relieves them under ordinary circumstances from the charge of contributory negligence in failing to look back.
2. A chauffeur who drives his machine at the rate of twenty-five miles an hour between the curb and a car which has stopped to discharge passengers, is guilty of negligence so gross and palpable as to be clearly willful.
3. In such a case the question whether the chauffeur bore the relation of servant and was acting within the scope of his employment, is one for the jury to determine from the evidence and surrounding circumstances.
4. A chauffeur who picks up some acquaintances while driving on an errand for his employer, and turns back one mile to take them to their destination, and during this detour strikes and injures a pedestrian, must be held to have been acting within the scope of his employment at the time of the accident.

*H. F. Payer,* for plaintiff.
*Hoyt, Dustin, Kelley, McKeehan & Andrews,* contra.

FORAN, J.

On May 13, 1913, the plaintiff in this action filed an amended petition in this court, alleging that about 4 P. M. of June 12, 1912, she was a passenger on an east-bound Payne avenue car

in the city of Cleveland; that the car stopped at the intersection of Payne avenue and East 27th street, both of which highways are public thoroughfares, for the purpose of enabling her to alight therefrom; that she descended from the steps of the car and was proceeding toward the southerly curb of Payne avenue, and had taken but a step or two in that direction, when the defendant, through his servant, one Stephen Pelrein, so recklessly and negligently managed and operated the defendant's automobile, which he was then and there driving, that the same collided with and ran over the plaintiff, causing her severe, painful and permanent injuries.   That the automobile was being driven in an easterly direction at the time, and the driver thereof was attempting to pass the street car on the southerly side thereof.

Certain traffic ordinances of the city of Cleveland, which it is claimed this driver disregarded, are pleaded; and the acts of negligence upon which plaintiff relies are specifically set forth.

By reason of the injuries plaintiff claims she sustained, she says she suffered pecuniary loss in the sum of $10,000.

About the time plaintiff filed this petition, and practically coincident therewith, her husband, Charles W. Whitford, brought an action against the defendant for the loss of the wife's services or consortium, due to the injuries plaintiff claims she sustained, to his damage in the sum of $1,000.

In his answer defendant admits the plaintiff sustained certain injuries in collision with his automobile on June 12, 1912, as alleged in her petition, but denies she was injured to the extent or in the manner claimed by her, and denies all the other allegations in the plaintiff's petition; and by way of defense says that whatever injuries plaintiff sustained on that occasion, if any, were caused solely and proximately by her want of ordinary care; and that if he was in any respect negligent, the plaintiff's own negligence contributed to any injury she sustained.

A reply was filed, denying the allegations of the answer which are not admissions of the claims set forth in the petition.

The plaintiff's cause of action was tried to a jury by another branch of this court during the April term, 1913, resulting in a verdict for the plaintiff, which, on motion for a new trial, was set aside and a new trial ordered.    Thereupon the parties entered into a written stipulation by which it is provided that a jury be waived, and the case of the plaintiff and that of her husband be tried to the court on a transcript of the evidence and exhibits produced at the previous trial of the plaintiff's case; and if the court should find the defendant liable, judgments aggregating $5,000 shall be entered against him in full satisfaction of the record.    The right to urge objections, motions and exceptions made and taken at the previous trial, and the right to prosecute error, are reserved.

Pursuant to this stipulation, the trial was had during the April term, 1914, the court acting in the dual capacity of trier of the facts and judge of the law.

It is admitted that the defendant owned but was not riding in the automobile at the time the plaintiff claims she was injured, and that one Stephen Pelrein was in his employ as a regular chauffeur.

The record is far from satisfactory.    Perhaps from a misconception of the legal principles involved, or the theory adopted by counsel, the case was loosely tried at the former hearing before the court and jury.    Counsel for plaintiff evidently brought to the trial of the cause a double theory, a bow with two strings; one to meet and overcome a persistently present obstacle and assert an ever present right, and another to provide for chance possibilities or contingencies that might arise.    To this end counsel diligently sought to convey the impression that Pelrein, the defendant's servant, was driving easterly on Payne avenue to meet, pick up or get his master at some point or place in the easterly point of the city.    This contention is absolutely groundless, and nowhere in the record is there a scintilla of evidence to sustain it.    Two witnesses testified that after the accident, when the plaintiff was in her own home, located a short distance from where the accident occurred, the chauffeur, who was present, said "he was then (at the time of the accident) on his way to

get his boss, Mr. Stewart.'' Objection to this testimony was overruled by the court, and exception taken. As the statement was merely the narration of a past transaction, the objection should have been sustained.

''The test of liability in all cases depends upon the question whether the injury was committed by the authority of the master, expressly conferred or fairly implied from the nature of the employment and the duties incident to it; and the declarations of the servants are not sufficient to establish such authority.'' *Wood, Law of Master and Servant*, Section 279; *Lee* v. *Nelms*, 57 Ga., 253.

If the jury received the impression that the chauffeur, as he drove easterly on Payne avenue, ''was then on his way to get his boss,'' the testimony was extremely prejudicial and should have been excluded. Pelrein was not a witness, and this is to be regretted, as he would undoubtedly have admitted what every one knows to be true—that he, as well as all chauffeurs acting as domestic servants, frequently and continually use their masters' cars for incidental purposes of their own. He would unquestionably have admitted that such deviation as he made just before the plaintiff was injured was such a common occurrence that the master's assent thereto would be fairly inferred and assumed as one of the incidents which every man who employs a chauffeur may be said to reasonably anticipate. Indeed we must admire, if we do not commend, the wisdom and ingenuity of counsel for the defendant in their apparent laches in failing to produce Pelrein as a witness, and in securing the stipulation they did as to what he would say if present as a witness. The stipulation is as follows:

''It is stipulated by counsel for both parties to this action that Stephen Pelrein, if he could be produced by the defendant, would testify substantially as follows: That on the 12th day of June, 1912, he was instructed by his employer, the defendant herein, to call for defendant with defendant's automobile at defendant's office in the Perry-Payne Building at about 4 o'clock P. M. That some little time before that hour in the afternoon of said day he started with his said machine and drove from defendant's residence on Shaker Heights down to Euclid avenue,

thence west on Euclid avenue to East 9th street, turning north on East 9th street.  At the corner of East 9th street and Superior avenue he met Mrs. M. Doreen, and upon learning that she and a witness, Mrs. Brolley, were intending to go east on Payne avenue to a dress-maker's on East 30th street near Payne avenue, he volunteered to take them to the dress-maker's in the machine.  That the accident in this case happened while on their way to the dress-maker's as aforesaid.''

The distance from the corner of East 9th street and Superior avenue to East 30th street on Payne avenue is just about one mile.

In this connection, the defendant's instructions to his servant are important.  He says (p. 73 of the record), when he left the machine in the morning he gave Pelrein positive instructions to be at the Perry-Payne Building at 4 o'clock that afternoon.  At the same time, in answer to a question as to instructions given, he said: ''Well, you may call them general, because he was *supposed* to be there at 4 o'clock every afternoon.'' As the record does not disclose any reason why the instructions should be any more specific on that day than on others, it is only fair to presume that the instructions were general as stated. The defendant might well assume the general instructions stood as a positive order, but there is no reason to believe that the instruction was specifically repeated that morning.  Asked when he left for home that day, June 12, 1913, he answered, ''I would say about 4 o'clock, 4:30,'' and that he was not conscious he had to wait that day, or at least he did not remember having to wait.  If he had, he would no doubt have remembered it.

Two questions arise:  First, was the chauffeur, Pelrein, negligent in causing the injuries of which plaintiff complains? Secondly, was he, at the time the injuries were inflicted, in the scope or orbit of his employment, so as to charge the defendant with liability?

To the first question there can be but one answer.  The negligence of Pelrein was so palpable and gross as to be clearly wilful; and if the plaintiff had been killed, he could and should have been tried and convicted of manslaughter,  Practically all the streets in Cleveland on which street car lines are located are

double-tracked; and as a measure of safety, the door for the entrance and exit of passengers is on the right-hand side of the car as it goes forward, and generally at the rear, so that passengers, in boarding or alighting, do not have to cross street car tracks. All vehicles going in the direction in which a street car is going must, if they pass the street car, go by the car door and through or over the space on which passengers must travel to reach the car in boarding or the sidewalk in alighting. The ordinance pleaded by plaintiff provides, ''That the driver of every vehicle shall stop such vehicle and remain at the rear of any street car which has stopped to take on or let off passengers, so as to allow passengers free passage between the street car and the curb; and the driver shall cause his vehicle to remain standing until such car has resumed motion.''

Every driver of motor vehicles in this city knows of this traffic regulation and is charged with knowledge of it. If Pelrein had obeyed the regulation, the plaintiff would not have been injured. Counsel for defendant insist this ordinance is unconstitutional and void. We think it is so far as it permits drivers of vehicles to pass standing street cars in congested districts if they clear six feet from the lower step of the car.

In *State* v. *Born,* 85 O. S., 430, the power or authority of the city of Cleveland to determine what is a congested district is expressly questioned if not denied, the court holding, ''The defendant had the right to have that fact (as to whether or not the locality was a congested district) determined generally by the jury upon evidence.''

Section 12603, General Code, provides against the operation of motor vehicles on streets at a speed greater than is reasonable or proper, having regard to the width, traffic, use and general rules of such road, or so as to endanger the property, life or limb of any person, etc.

If the last paragraph of the ordinance permitting drivers to pass standing street cars in congested districts, if they clear six feet from the lower step, could be invoked as a defense to negligent drivers under such circumstances, it would clearly contravene the provisions of this section of the statutes, and therefore

be void and of no effect.   We are not called upon, however, to
pass upon the validity of this ordinance.   The facts do not re-
quire it.   The regulation has become a traffic custom or rule.
Passengers on street cars know of it, and have a right to antici-
pate that drivers of all vehicles will respect it as such, and can
not be charged necessarily with contributory negligence, even if
they fail to look to the right when alighting from street cars.
The drivers of motor vehicles know, and are charged with know-
ing, that passengers presume they will stop in the rear of a
car that has stopped to let off passengers and ordinary care re-
quires them to act accordingly.   The driver of a motor vehicle,
seeing a street car ahead of him, stopped, will be presumed to
know that women are liable to alight from the car, or liable to
step from the sidewalk onto the street to board the car; and that,
owing to their skirts of fashion's chance, they can neither mount
the platform with a nimble skip or reach the sidewalk with a
flying leap.

The plaintiff testified that when the car stopped she looked to
the right and left and saw no one and heard no signal; that she
had taken but three steps when the automobile was upon her, and
she could not get out of the way; and that the driver, Pelrein,
said he was going at such a pace that he could not stop.   As
this admission was made after the accident, it is more than
doubtful if it is competent to bind the defendant, but it was not
objected to, appears in the record and was not denied.

The conductor of the street car testified that he stopped his
car to let plaintiff off; that he was standing on the rear platform
of his car at the time, and that he had a clear view to the rear
or westward; that he saw the automobile when it was about one
hundred feet away, driving in the car tracks and coming at a
speed of twenty-five to thirty miles an hour; that when it got to
within about forty feet of the car it swerved out to the right-
hand side and went past the car; that he saw the driver would
not be able to stop the automobile, and he then hollered to the
plaintiff, who had taken but two or three steps, and that she
threw herself backward and the automobile ran over her foot.
He also testified that the doors of the car swung outward eigh-

teen inches, and this prevented the plaintiff from seeing the automobile which, as she alighted, was driving in the same direction in the rear of the car.

It must be admitted that the conductor was a disinterested witness, and with his opportunities of seeing the whole situation, his evidence must be accepted as literally true. He is in no way related to the plaintiff, and, so far as appears, has no possible interest in the outcome of the litigation. The chauffeur, Pelrein, will not be heard to say that he did not see the street car or know that it had stopped when he was over one hundred feet away; for if the operator of a motor or other vehicle fails to see that which is in plain view, in legal contemplation he will be held to have seen it. *McDonald* v. *Yoder,* 80 Kan., 25; *Spangler* v. *Markley,* 39 Pa. Sup., 351.

A Mrs. Brolley was the only witness called by the defendant as to the accident. She was one of the ladies riding with Pelrein. She says that before they reached the street car Pelrein turned into the car tracks to pass some team on the street, and "then he tried to drive back into the road, and the street car and the automobile were both together." She says further that plaintiff "stepped out of the street car and dodged back and forth," and the rear wheel of the automobile struck her.

It is difficult to understand how this statement in any way sustains the allegations of the defendant's answer; for if, when Pelrein tried to turn into the road, to the right of the street car, or after he had turned in, both the automobile and the street car were then together, or alongside of each other, the conclusion is inevitable that he remained in the street car tracks until he had practically reached the car, and then turned sharply to the right and swung into the roadway alongside of the street car door as the plaintiff was alighting, a careless and negligent thing to do under the circumstances if the automobile could have been stopped or its speed checked.

The testimony of this witness can not be seriously considered. The conductor, who had a clear view of the whole situation, does not mention the teams in the roadway, and their presence there at the time is more than doubtful. The chauffeur was driving in the car tracks, treking on the rails, because it was smoother

traveling than on the payment.  They may have passed teams farther back or before they reached the street car, and the witness was confused as to the time.

It is quite significant that the other occupant of the automobile, Mrs. Doreen, was not called.   It was said she was in a hospital, but no reason is given why her deposition was not secured.

We hold that the negligence of Pelrein was so gross and wilful that, as was remarked by Justice Grier of the Supreme Court of the United States in the case in which we will refer presently, his retention by the defendant furnishes some evidence of negligence on the part of the defendant in the selection and retention of the servant; and this upon the theory that a master is bound to use ordinary care not only in selecting competent servants, but in promptly discharging them if they prove to be incompetent.

The natural instincts of a man are unconsciously manifested in spite of the ''curb and rein'' of the ego.   A naturally careful and prudent man is never reckless; a naturally heedless, reckless man may be careful and prudent sometimes, but he is never so at all times.

The second question to be determined—was Pelrein, at the time he ran over the plaintiff, within or in the scope of his employment?—is not so easily answered.   The main difficulty lies in formulating a definition of what is meant by ''line of duty'' or ''scope of employment.''   It will be admitted that no rule can be laid down that will fit all cases that arise in this relation, and that each case must be decided upon its own facts and circumstances.   If by ''scope'' is meant, as the lexicographers say, the thing in view, that which is aimed at, the end or aim to be kept in view, the ultimate design, aim, purpose or intention, there would seem to be no difficulty in concluding and asserting that the ultimate design and aim, the controlling purpose and intention of Pelrein when he started from the defendant's home on Shaker Heights, was to go to the Perry-Payne Building, and there await the defendant's pleasure to either take him home or to such other place as he might choose to go.   This was the thing in view, kept in view, and accomplished as designed.

This was the duty he started out to perform, and he performed it on time, and to the entire satisfaction of the defendant. No complaint is made that he was not at the place directed, and at the time. ordered by the defendant. The record does not disclose that the defendant was delayed a second of time or in the slightest degree inconvenienced by anything the servant did on the way from defendant's residence to his office. The claim, however, is, that because the servant, admitting he never lost sight of the main and controlling purpose for which he was put in motion by the defendant's orders, temporarily or momentarily stepped aside or delayed for a purpose of his own, he was not in the scope of his employment while in the accomplishment of that personal purpose. In other words, the contention is, that while a domestic servant is on duty, he must do no act during that time unless an act which is of service and benefit to the master. Some courts have so held, but we believe the overwhelming weight of authority is decidedly against the proposition. Except in a few isolated instances, the tendency of courts has always been to solve doubts against the employer in determining whether the act is within the scope of the servant's employment, to the extent at least of submitting the question as one of fact to the jury (*Johnson* v. *Chicago, etc., R. R. Co.*, 141 N. W., 430). In cases where the servant acts maliciously and inflicts injury upon third persons, it has been held that the law does not undertake to make any nice distinctions fixing with precision the line that separates the act of the servant from the act of the individual. When there is doubt, it will be resolved against the master, upon the ground that he set in motion the servant who committed the wrong (*Railroad Co.* v. *Cleveland*, 11 L. R. A. (N. S.), 853; *Fishing Club* v. *Stewart*, 93 S. W., 598; *Thompson on Negligence*, Sections 544-564). As negligence is often so gross, as in the case before us, that it may be said to be malicious or wilful, there does not seem to be any good reason why this doctrine does not apply to all negligence cases. On the other hand, many courts, mindful of the broad, fundamental proposition that persons should only be held to answer for their own wrong, have endeavored to circumscribe into as narrow limits as is consistent with human rights the doctrine predicated upon the maxim, *qui*

*facit per alium facit per se,* holding a master responsible for the wrongful acts of his servant; and as this doctrine is in direct antagonism with the broader doctrine of personal responsibility, some courts have regarded it with much jealousy. But Mr. Wood, Master and Servant, Section 277, pertinently says:

"Servants generally are irresponsible and unable to respond in damages for the injuries inflicted by them in the prosecution of their master's business; so that it is regarded as no more than just that he who has made it possible for him to injure another should, so far as the injury results from the exercise of powers conferred upon him, be responsible in his stead. * * * While the interests of society on one hand require that the right to act by another should be recognized, yet, upon the other hand, the same interests require that a person who does act by another should, so far as he has entrusted such person with authority to act for him, be responsible for the method and manner in which he exercises the power, thus imposing upon the masters the exercise of proper care and diligence in the selection and retention of their servants. The rule is predicated upon principles of justice, and is sustained by sound public policy."

It will be noticed that this learned author insists that the master must exercise proper care and diligence, not only in the selection but in the retention of his agents and servants. Third persons who are injured by the negligence of a servant wholly irresponsible can not reasonably be expected to look with favor upon the claims of the master that his servant was not acting within the scope of his employment at the time the injury was inflicted, and with the instrumentalities placed in the hands of the servant by the master. In justice and reason it seems to them that the man who put the force in motion ought to be responsible for the failure to exercise due care in controlling it while in motion. That eminent jurist, Judge Ranney, seemed to have this idea in mind in *Keary* v. *R. R. Co.,* 3 O. S., 209, where it was said that—

"No one has a right to put in operation forces calculated to endanger life and property without placing them under the control of a competent and ever-active superintending intelligence."

But we are told that a gasoline touring car in operation is not a force calculated to endanger life and property. Indeed the courts seem to hold that such a vehicle is no more dangerous than a carriage drawn by animal power. Of course this depends upon how it is managed and operated. No one will deny that a reckless and incompetent man is infinitely more dangerous in a touring car than he would be in a carriage drawn by a team of horses. But aside from the mode and manner of use, there are potential possibilities of danger in a large high-power automobile that can not possibly exist in a horse-drawn carriage. The automobile is driven by *vis a tergo* power, and in the nature of things is not as easily controlled in emergencies where automatism contends with "mind stuff." In the hands of the reckless—and it is too often in the hands of the reckless—this gift of the gods becomes a potent ally of the "Grizzly King," this golden car of progress becomes the drab ambulance of destruction. If there be any truth in this judicial statement, then the editors of all the newspapers who daily fill their columns with details and the names of the victims of automobile accidents ought to be enrolled in the National Ananias Club. As a jurist, I acquiesce in the statement that it is as harmless as a horse-driven phaeton, but I remain a Galileo.

In an examination of the authorities bearing upon the meaning of the phrase, "within the scope of employment," two lines of thought are discernible, one giving a circumscribed or strict and the other a broad and liberal construction to the doctrine predicated upon the maxim, *qui facit per alium facit per se,* the great preponderance of weight of authority being in favor of the broad or liberal construction. Much subtlety, refinement of reasoning and caustical hair-splitting distinctions are to be noticed in the opinions of courts and the texts of law writers. For instance, when it is asserted that while deviations from the straight line of duty are immaterial, or that mere mingling by the servant of some purpose of his own with that of the master will not relieve the master of liability, or that the immediate pursuit of the master's business is necessarily subject to usual incidental personal acts, slight delays and deflections, it is answered that these acts lie, so to speak, within the penumbra of

the authority actually conferred by the master reflected upon the servant casts a shadow of authority, and that the acts of the servant, which it is insisted on the one hand did not relieve the master of liability, really fell within the penumbra of this shadow, and therefore, because of their remoteness from the master's business, do relieve the master of liability. An examination of a number of these authorities may enable us to see our way clearly and reach a definite conclusion upon the facts now before us. Some of the authorities cited by counsel relate to cases of agency, and will not be considered, as there is a distinction.between a servant and an agent. A servant is one who serves another; an agent one who acts for another (*Austin on Jurisprudence* [Third Edition], 976; *Northey* v. *Trevillion,* 18 Times L. R., 648). The authorities seem clearly to hold that there is a distinction between a household or domestic servant and an employee or workman. The household servant not only performs service for the benefit and interest of the master, but also ministers to his pleasure. He is hired to assist in domestic matters, and usually lives within the employer's house or upon his premises, and is regarded as part of the family. He is subject to the master's orders at all times during the day or evening, unless expressly relieved from duty. To a considerable extent, the master stands in the relation of *pater familias* to servants of this class. The employee or workman lives in his own home; his daily hours of labor are definitely fixed, and in this state, except by express contract, at eight hours. During the other sixteen hours of the day his time is absolutely his own; and if, by express agreement, he works overtime, he is paid for the extra labor; but during the period that his time is his own, the master has no control over him; the relation of master and servant has ceased to exist, during this period, as absolutely as if they were strangers. This distinction was early recognized in *Laugher* v. *Pointer,* 5 B. & C., 553. Littledale, J., remarked:

"For the acts of a man's own domestic servants there is no doubt but the law makes him liable; and if this accident had been occasioned by a coachman who constituted a part of the defendant's family, there would be no doubt of the defendant's liability."

We will have something further to say about the facts of this case.

Counsel for the defendant contend that the doctrine of *respondeat superior,* which is really the result or consequence of applying the legal maxim, *qui facit per alium facit per se,* should be limited to those cases where authority to do the act resulting in the injury has actually been conferred upon the servant. *Beven on Negligence in Law,* 573, says: "There is no good reason why this meaning should be so limited."

*Shearman & Redfield* (6th Edition), Section 147*a,* after stating the rule as contended for by counsel for the defendant, say:

"There is, however, a line of cases to the effect that slight deviation from the master's service will not defeat his liability. Such indeed seems to be the established rule in the English courts."

Then after stating his opinion of the English rule, the author proceeds:

"It would seem, therefore, that probably all that the commentator is authorized to say is that the rule on this subject is in a state of transition with a tendency to hold slight deviations immaterial. This, too, it must be recognized, is consistent with the generally received doctrine that the mere mingling by the servant of some purpose of his own with that of the master will not relieve the master of liability. One does not cease to be acting in the course of his master's employment because his most direct and immediate pursuit of the master's business is subject to necessary, usual, or incidental personal acts, nor even by slight and immaterial delays or deflections from the most direct route for a personal or private purpose, the pursuit of the master's business continuing to be his controlling purpose. Such acts, not amounting to a turning aside completely from the master's business so as to be inconsistent with its pursuit, are often only what might be reasonably anticipated, to which therefore the master's assent may be fairly assumed; or they are, in many instances, but the mingling with the pursuit of the master's business some purpose of the servant's own. Moreover, it must often be proper to submit the question to a jury upon the issue of materiality, hence it is not to be expected that the decisions will in all cases be harmonious."

It must of course be admitted that where there is authority to do a thing, where the hand that does it may be the servants, yet the reason of the act is the master's authorization or the master's interest, and therefore the master, as the motive power, is held responsible. But as Beven says, page 574, "the law goes further than this, and where there is authority to do an act, the master's authorization covers all acts, whether implicated in, or subsidiary to, the main action, not those merely which are necessary to effectually do it."

It will be noticed that the commentator (Sherman & Redfield) says the law upon this question is in a state of transition. Just now mechanical forces and social dynamical conditions are in a state of eruptive transition, and the law must adjust itself to the lightning forward leaps man is making on the highway of material and social progress. It is a far cry from the ox cart, whose wheels were the sawed-off ends of a log, to the automobile and aeroplane; and great indeed is the gap between the age when the news of disaster or invasion was spread by the Greek runner or the Persian courier and the time when the human voice goes singing like thought along the pulsing wire a thousand miles away, and man throws his expressed thought, his desires and his hopes into etheric vibrations, and instantly plucks them out of the sky at any point on this air-belted globe. Amidst these mighty mutations which throw us into vastly higher-geared modes of life and being must we, so far as our legal rights are concerned, remain chained to the Promethian rock of precedent and have our vitals gnawed by greed and avarice, because courts seem unwilling to break the fetters of *stare decisis* rules that were formulated to meet conditions incident to man as he emerged from the mists and shadows of prehistoric times. The world is swinging onward with mighty strides; and while it is the province of courts to prevent the debacle of civilization, yet they should keep in touch with and conform, as nearly as the safety of society will permit, to this forward movement of dynamic forces.

If a master insisted that his chauffeur should not under any circumstances, while out with his car on the master's business,

stop to talk to a friend or use the car to do an errand of his own, or even pick up a friend of the master or of his own and take him to his office, if the friend was going practically in the same general direction the servant's errand or the master's business carried him, he could not retain the services of the chauffeur for any length of time. Every man who keeps a chauffeur knows he does these things. They are acts which, from the nature of the business and by custom and usage, are reasonably to be anticipated by the master, and his assent to them must be fairly assumed; and unless an act of this kind amounts to such a complete abandonment of the master's service that it can be said the pursuit of the master's business ceases to be the controlling purpose and ultimate design of the servant, the master will not be heard to complain, and say that the servant, in doing such acts incidental and consequential to the service, was not in the scope of his employment. Servants could not be retained or their services secured if they were denied privileges of this kind, and hence it can be fairly said they are incident and even subsidiary to the service. They are, so to speak, perquisites of the service. A household or domestic servant who lives in the master's house or on his premises must of necessity purchase clothing or other necessary articles personal to himself; he may have to consult a physician, see a dentist or secure the services of a barber, or see a friend on a personal matter, and he may not be relieved from duty until after business hours. These things he must of necessity do during business hours, when he is on errands or business for the master or members of his family with the master's carriage or automobile. Every man who keeps a chauffeur or coachman knows this and impliedly assents to it.

That Pelrein was a domestic or household servant is, indirectly at least, shown by the record. The witness McCahan says he called at the defendant's residence one evening about 6 o'clock, that Pelrein was on the premises near the garage and, as the defendant says, raking grass. McCahan did not leave the defendant's place until some time after 6 o'clock P. M., and Pelrein was still there.

The word chauffeur, as used or applied to a man who drives a private car, is synonymous with coachman. In French, from

which the word is derived, it means a fireman or stoker.  Historically, the word meant a robber who used to burn the feet of his victims to make them surrender their money; hence its application to the taxicab driver seems fictitious.

Counsel for defendant admit that if a servant is driving his master's car, say, in a general westerly direction on the master's business, he may make a slight detour or deviation from the most direct route to the point or place the master's business calls him or requires him to go; but they insist that deviation or detour means a temporary divergence from the straight course and then a trend or inclination toward it, as if one were to travel on the curve and not through the center of an elongated elipse; and they further insist that if the servant turns back and goes in an opposite direction any distance, this is a complete departure from the scope of his employment and is not a deviation, the contention being that deviation means a slight deflection to the right or left from the straight-forward course or direct line in which a man is traveling.  In this we can not agree with counsel, nor do the authorities.  Even the ordinary meaning of the word deviation can not be so restricted or limited, but the word as a legal term has a well-defined meaning.  It was first so used in marine insurance policies, and deviation was held to occur when in a policy a course was definitely specified and the vessel departed from it, or if a vessel departed from the course usually or customarily followed.  If the policy provides for certain named ports of discharge, the vessel must take them in the order in which they appear in the policy.  If she goes to the second or third port named in the policy and then turns back in a directly opposite line to the first, there is a deviation.

"Unreasonable or unexcusable *delay* is deviation, whether the *delay* be upon the high seas or in port." *Arnold* v. *Pacific Mut. Ins. Co.*, 78 N. Y., 716.

"Strictly speaking, a deviation originally meant only a departure from the course of the voyage, but now it is always understood in the sense of a material departure from or change in the risk without just cause." *2 Parsons on Marine Insurance*, 1, quoted with approval in *Wilkins* v. *Insurance Co.*, 30 O. S., 341.

A provision in a building contract providing that a "deviation" from the plans should be paid for, it was held that extra work was a deviation (*Dunn* v. *Stokern*, 3 Atl., 349). Whether deviations, detours or delays by a servant enhance the master's risk depends upon the "mind stuff" of the servant. He might be just as negligent or more so if he did not deviate or delay. Physical and meteorological conditions might affect the risk in vessel deviations. Accompanying the mechanical phenomena of action in prudent normal men, but wholly disconnected from it, we always find the phenomena of alert consciousness which means attention and care, while the lack of such consciousness means want of attention, and negligence; but this want of care may manifest itself at any time or place; but the greatest care can not avoid unknown or uncharted rocks and shoals, or avoid and prevent storms which are governed by fixed physical laws.

When Pelrein started from his master's home on Shaker Heights, a city map in evidence shows he had a choice of three or four routes all leading more or less directly to the Perry-Payne Building. He was not restricted to any of these routes, either of which would have taken him to his destination in practically the same time. If he met with an accident on any route selected, it would be absurd to say he would have avoided it if he had selected or taken a different route, for if the phenomena of alert consciousness did not accompany the phenomena of action, it would make no difference which route he selected. If on any route he selected he stopped five or ten minutes to talk with a friend, and shortly thereafter collided with a truck crossing an intersecting street, it would be sheer nonsense to charge the accident to the delay, for if the delay had been a few seconds greater the truck would have passed through the intersection and the accident would not have happened. So it will be seen a deviation, detour or delay does not necessarily change or enhance the risk. Lack of attention or inability to fix and hold in the mind that watchful observation essential to the successful performance of an act requiring care, means lack or want of active consciousness, and it as much a mental defect as loss of memory. A man naturally deficient in attention is apt to be

negligent at all times and in all places. This defect being inherent and constitutional, it seems strange the defendant did not observe it in this servant; and while the defendant can not be held liable merely because he retained an incompetent servant in his service, unless the evidence clearly shows that fact, the rule ought not to be strained, under the circumstances, to relieve him from liability. Reckless driving on the streets of a populous city by a man in all respects normal is criminal; and it is no more than charitable to assume that Pelrein was simply negligent because of constitutional defective attention or lack of active consciousness.

Suppose when Pelrein turned north from Euclid avenue on East Ninth street, he had turned east on Superior avenue when he reached that thoroughfare, and drove three or four hundred feet, to leave his measure for a suit of clothes or to buy a pair of shoes, would the defendant be heard to say this was such deviation, if an accident occurred while he was driving east or returning, as to relieve him from liability? If Pelrein could turn back on Superior three or four hundred feet and still be in the pursuit of his master's business and in the line of his duty, the distance he might travel east before it could be said he had abandoned the master's service would be one of degree, and that would be a question to be submitted to the jury.

In addition to the large number of authorities cited by counsel, the court has examined a great many others; and while there is an apparent conflict in the adjudicated cases, a close analysis clearly shows that in most instances the conflict is more apparent than real. In no two cases examined are the facts precisely the same; and as each case is or ought to be decided upon its own facts and circumstances, the application of a general rule, if one could be accurately stated, to the facts and circumstances of every case would be wholly impossible; but running through the labyrinth of sophistry and the bewildering maze of subtle reasoning of practically all of the cases, some general principles are clearly marked and broadly stated; and while their application to divergent and variable facts may seem confusing, yet they are distinguishable and reconcilable.

The authorities examined establish, we believe, the following propositions:

I.   The law defining what is meant by ''in the line of duty or scope of employment'' as used where the relation of master and servant exists, is undergoing transition, the tendency being to enlarge the liability of the master who has placed in the hands of his servant the means or intrumentality by which the injury is occasioned to third persons; and where there is doubt as to whether the relation of master and servant exists, or whether the servant at the time of the injury was in the scope of his employment, the question is one of fact for the jury to determine under the evidence and circumstances surrounding the situation.

II.   In cases where the servant obtains or takes possession of the instrumentality, such as the carriage or automobile of the master, without his knowledge or consent or under such circumstances that the master's assent thereto can not be fairly inferred, and uses the same for a purpose wholly his own, in no way connected with the master's business, and at the time of such use is performing no service for the master, the master is not liable for an injury to third persons during the period of such unauthorized or unlawful use by the servant of the master's carriage, automobile or other instrumentality of like or similar character.

III.   Where the servant is rightfully in possession of the carriage or automobile of the master, going on an errand or trip of any kind for the master, or returning to the master's home from such trip or after having performed such errand, the mere mingling by the servant of his usual, necessary and customary personal business with that of the master's business will not relieve the master from liability if an injury is sustained, through the negligence of the servant, by a third person while the servant is so using the master's carriage or automobile for such personal purpose; or if, while the servant is so using the instrumentalities of the master, or driving the same, he makes an immaterial deviation or stops to talk to a friend, or takes a friend with him on the way, if the delay be not unreasonable,

the master is not relieved from responsibility. Such acts for personal ends, such deviations and delays and such use of the master's carriage and automobile are incident to the service and are of such common and frequent occurrence that the master's assent to such use may be fairly presumed, and that such use was within the master's contemplation when the contract of service was made.

IV. Where the deviation, delay or the mingling by the servant of his personal business with that of the master's, occurring where the servant is given possession of the carriage or automobile of the master to be used in his business, the extent and materiality of the deviation, delay or mingling of the servant's personal business with that of the master becomes important in determining whether the servant, at the time, was acting within the scope of his employment, and the courts have uniformly held this was a question of fact to be determined by the jury.

V. Unless the deviation, delay or mingling of the servant's private affairs with the business of the master was manifestly so marked, unreasonable and unusual that it could be fairly said the servant subordinated the master's business to his own, and that his motive and intention, gathered and deduced from his conduct, clearly shows that his own pleasure or purpose was the primary and that of the master the secondary object, aim and design he had in view, in which case it may be a question of law for the court.

VI. While the servant is performing a duty for the master, such as driving the carriage or automobile to some place directed by the master or driving it to the master's home after some duty has been performed, and immaterial deviations or delays occur, the motive and intention of the servant is important in determining whether or not the deviations, delays or other immaterial acts took him out of the orbit of his employment. If his controlling purpose and ultimate aim and design was to accomplish the duty assigned him, within a reasonable time or within the period of time designated by the master, and he did so accomplish or perform the duty, it can not be said as a matter of law that the immaterial deviations, delays or other acts took him out of the orbit of his employment.

VII.   If a servant, having possession of his master's automobile or carriage, goes "on a frolic of his own," the frolic meaning of carouse, lark or spree, the master is not liable for injuries inflicted by the servant using his automobile or carriage during such frolic.   Such conduct is not incident to the servant's duty or service; it was not in contemplation of the master when the contract of service was made; it is such gross and unreasonable abuse of the master's confidence, it so changes and enhances the master's risk, that, as the rule now exists, it can be said as matter of law the master is released from liability, even if there remained in the muddled mind of the driver a vague and hazy concept of the duty he owed to his master, and a vagrant, indeterminate purpose to perform it some time at his convenience or when the frolic had spent its force and lost its charm.   The servant who goes "on a frolic of his own," even if he does not intend to abandon the master's service, puts himself in a position where it may not be possible for him to perform the task assigned him.

That *intention* is a controlling factor in determining whether the servant's act took him out of the scope of his employment, is held in *College Co.* v. *Lloyd,* 60 O. S., 448, where it is said in the syllabus:

. "When the act complained of may or may not be, from its nature, in the course of the servant's employment, and this depends upon the real motive or purpose of the servant in doing the act, it is a question for the jury to determine upon a consideration of all the circumstances adduced in the evidence."

This case is so familiar that only a cursory review of the facts is necessary.   The plaintiff was injured by the act of the janitor of the defendant, and there was some evidence that the janitor's act was inspired by ill-will.   The plaintiff was called in to repair an electric light, and had his ladder upon a table for that purpose.   The janitor was engaged in cleaning out the room and wanted to move this table.   He told the plaintiff to get down, and because he did not do so, it is said he became impatient and "violently shoved the table, throwing the plaintiff from the table to the floor and inflicting injury."   This act of the jani-

tor would seem to be a clear departure from his employment, especially so if he availed himself of this opportunity to injure the plaintiff because of ill-will. The court, however, thought that there was no doubt but that the janitor was at the time engaged in the performance of his duty, and that whether he was or was not was a question which should have been submitted to the jury. If the act or motive of the janitor, under these circumstances, can be said to be a question of fact for the jury and not a question of law for the court, how much more strongly can it be urged that it was for the jury to say whether Pelrein intended to abandon his master's service when he turned east on Payne avenue, or whether his intention was to merely accommodate some ladies that he knew, his controlling purpose all the time being to ultimately accomplish the object and aim which he started out to perform, that was to go to the Perry-Payne Building for his master. It was Pelrein's duty to be at the Perry-Payne Building in time to take his master home. This was his ultimate design and object. When he went east on Payne avenue, did he have any purpose or motive to abandon this design or purpose? Certainly not. He told the ladies he had a few moments to spare, that is, that he could drive them to the dress-maker's and still be on time at the Perry-Payne Building to perform the service upon which he was then engaged and which was the main and controlling purpose he had in view and which he ultimately performed.

In *Ritchie* v. *Walter,* 63 Conn., 155, which is a leading case, it was said by the court in the opinion, at page 161, that the general rule of construction is, that the intent of the party shall prevail.

Counsel for defendant cite many authorities but rely mainly upon *Rawson* v. *Olds Motor Works,* 20 C.C.(N.S.), 182, affirmed by Supreme Court, June 29, 1914, without opinion. The facts of this case are in no respect similar to those in the case before us. They fall clearly within the scope of propositions 5 and 7 above stated. These facts are as follows: One William Clark was an employee of the Olds Motor Works, working for the defendant. About 6 o'clock P. M. of September 28, 1908, when his

employment for the day had terminated, he was directed by the foreman to take a certain automobile to the dock of the Detroit & Cleveland Navigation Company, a mile away, and ship it to Detroit. This service he could perform in fifteen minutes at the outside. Instead of executing this commission as directed, he proceeded to a restaurant, had his supper, drank beer, and started "on a frolic of his own" by inviting two or three waitresses to go with him on the frolic. The invitation was accepted, and the frolic began by a drive of over three miles on various down-town streets, and ended at 8 P. M. in the death of the plaintiff's decedent, who was run down by Clark while driving defendant's automobile. The trial court, Keeler, J., in granting a motion directing a verdict for the defendant, said (12 N.P. [N.S.], 125):

"The driver had been told by Mr. Booth, of defendant company, to take the automobile direct to the Detroit boat for shipment as soon as he could do so, so as to have it properly tagged and freighted. * * * The driver changed his course not less than nine times in covering a distance of probably three miles. The extent of the deviation or *extra viam* was great, marked and unusual. * * * He was going east on St. Clair avenue at the time of the collision, his destination being Euclid Beach Park, some twelve miles east of the boat landing."

Bearing in mind that Clark's motive and his intention to drive twelve miles east on a frolic of his own is essential to the inquiry before us, this simple statement of facts clearly demonstrates that he had subordinated the master's business to his own pleasure; and while he may have intended to ultimately, if he fell not by the wayside, ship the car to Detroit, that purpose was a secondary and the frolic of his own the primary object and aim he had in view. A simple test will show conclusively that at the time he ran over the decedent he was not in the employment or service of the Olds Motor Works. Suppose he had not killed the decedent or met with any accident, but simply used the car for two hours, or until 8 P. M. for a purpose of his own, could he successfully maintain an action against the Olds Motor Works for two hours extra work? Surely not, for the reason that he was not working or performing service of any

kind for that company during all of these two hours.   The relation of master and servant is reciprocal.   There is a promise to perform service and a promise to pay for the service.   On the other hand, if a domestic servant uses his master's automobile for a necessary or incidental purpose of his own, or if he delays for ten, fifteen or thirty minutes in executing the master's business, would the master, in a suit by the servant for his salary, be permitted to urge such loss of time as a set-off against the servant's claim?   In the Rawson case the relation of master and servant would cease when Clark performed the services he was directed to perform, and this service he could have performed in from fifteen to twenty minutes. after he was given the commission.   He was directed to take the car directly to the boat as soon as it could be done, and for the extra time in so doing or in taking the automobile to the boat he would be entitled to compensation, but he would not be entitled to compensation of any time that was not necessary to perform that service, and therefore would not be in the service of the master at all.   After he had performed the service, which could have been performed, as we have said, in from fifteen to twenty minutes, his time was his own, and he could not charge the master for a second of that time.   As soon as the car could be taken to the boat and tagged for shipment, the employment of Clark terminated for that day.   If what Clark did could be termed a deviation, it was, as the trial court justly remarked, great, marked and unusual, and he intended it to be much greater, for if he had reached Euclid Beach Park and succeeded in ever reaching the boat before it left for Detroit, he would have traveled over thirty miles.   The trip he intended to take was a separate and distinct journey.   Turning back on a street for a mile is not in any sense a journey.   It would be a misuse of language to so call it.

The Rawson case is typical of a driver going on a frolic of his own, and it ended as such frolics usually do, and the master could not be held responsible under any rule of law, or on any theory except that he entrusted the car to Clark, and thus put in motion the force that did the mischief.   This some day, under proper limitations, may be the law, but it is not the law as we

find it.   Under the present state of the law, the most we can say or are permitted to say is, that the law as we find it does not make nice or fine distinctions fixing with exact precision the line that separates the act of the servant from the act of the individual; and if there is a doubt, to resolve it against the master for the reason that he set the servant in motion.   In the Rawson case there could be no doubt.   The departure and intended departure from the line of duty was so great, gross and unreasonable that it amounted to a complete abandonment of duty. No one knows what might have happened if the frolic had proceeded as intended and contemplated.   The doctrine of this case has not even a remote bearing upon the facts in the case before us, nor can the doctrine in any possible way be applied to these facts.

There are many exceptions to the general rule, one being, as stated in proposition II, that when the servant departs from the performance of his master's business and wrongfully goes with the master's materials unlawfully taken, and undertakes to do something on his own account, the master ceases to be responsible for the servant's negligence.   *Mitchell* v. *Craswellar,* 13 C B., 237; *Little Miami R. R. Co.* v. *Wetmore,* 10 O. S., 110.

In *McKenzie* v. *McLeod,* 10 Bing., 385, decided in 1834, the exception was pushed to its farthest limit, as it was there held that the master was not liable for the negligence of the servant in burning down a house while trying to cleanse a chimney, it being shown that the servant was not told to cleanse the chimney, but to light a fire.   To hold at this late day that a tenant would not be liable for the negligent acts of a servant in burning down the house of his landlord would be regarded as a strange doctrine.

Counsel for defendant cite *Kavanaugh* v. *Dinsmore,* 12 Hun., 465, where it appears that the defendant's servant had delivered merchandise at the office of defendant on Broadway in New York, and had then been directed to take the truck to a stable on Church street and to put it up.   In proceeding to carry out this direction of the master he met another servant, and as a personal favor to him drove to another street a mile distant, and

took a trunk belonging to the other servant to deliver at another place.   It was held that as the defendant had not authorized the driver to go to Henry street, the driver was not acting in the business of the master.   We know of no reason for the decision, except that the servant was directed to do a specific thing, and in failing to do that specific thing he departed from the line of his duty.

*McCarthy* v. *Timins,* 178 Mass., 378, is relied upon by defendants.   In this case it was held that the driver of a public carriage is not acting within the scope of his employment when ordered to drive to a stable, his day's work being done, if he turned out of his course and drove some distance in an opposite direction in order to visit a saloon to get a drink, and there left his horses unattended, and they, breaking loose, ran away and injured the plaintiff because the driver had left them unattended.   In this case it appears (page 381) that the driver's work was ended for the day.   He was then directed to go to the stables, and so long as he had that end in view, and for that purpose and for no purpose of his own, he was engaged in the master's business, even if he made a detour contrary to the direction of his master, but when he went to the saloon for the drink he was on no errand for his master.   Hence the court say, "This journey was not for the purpose of getting to the stable even by circuitous route; or, to use the language of Hoar, J., in *Howe* v. *Newmarch,* 12 Allen, 449, he was doing an act wholly for a purpose of his own, disregarding the object for which he was employed and not intending by his act to execute, and not within the scope of his employment."

It clearly appears in this case that at the time of the accident the defendant's driver was emancipated, that is, defendant's work had been done for that day, and the servant was no longer in his employment, except for the mere purpose of taking the horses to the stable; and as soon as that should be done, he being given a reasonable time in which to do it, he became his own master, and the defendant was in no way responsible to him, he could not be asked to respond to him for any extra time which he may have consumed in unreasonably delaying to perform the service he was distinctly instructed to do.

The case of *Patterson* v. *Case,* 152 Fed., 481, cited by defendant, is directly in point and is practically the only case cited by counsel for defendant supporting their contention; but the doctrine in this case is in direct contravention to the doctrine laid down in *Philadelphia & Reading Railroad Co.* v. *Derby,* decided by the Supreme Court of the United States at the December term, 1852. The case will be found in 14 How. or the 55 U. S., 467, and will be referred to hereafter.

Possibly in the Patterson case, 152 Fed., 481, *supra,* the fact that the driver of the automobile went into a saloon, where he remained for some time, and then took some friends with him as he drove back over the road which he had taken, may have led the court to believe that there was some evidence that the driver was "on a frolic of his own" at the time plaintiff was injured.

*Danforth* v. *Fisher,* 75 N. H., 111, is also cited by the defendant and is an automobile case. It was decided in November, 1908. The chauffeur took his master's car from the place where it was kept and drove to his store to await orders. He was told to get his supper and be at the City Hall with the car at a quarter before seven o'clock. Instead of doing this, after he had eaten his supper he drove the car to Manchester, a mile or two from his boarding house, and in an opposite direction from the hotel, for the purpose of calling upon a friend, the injury to the plaintiff occurring while he was making this call. It will be noticed that in this case there was also a specific direction to do a particular thing, that is, the duty and discretion of the servant were limited.

*Northup* v. *Robinson,* 33 R. I., 496, is another case cited by the defendant. It appears in this case that the driver started out, on the morning that the plaintiff was injured, from the defendant's house under directions to go to an express office for his employer. Instead of going to the express office, as he was directed to do, he started to deliver a note for a gardener who was employed on the defendant's premises to the gardener's wife who lived on another road some distance away. The court say (page 497):

"It appears the chauffeur had a definite errand from the master, namely, to go to the plaintiff's office, to the express office, and back to the master's house."

And that because he departed from this express order, the master was held not liable. Or, in other words, there being a definite and positive instruction given to do a certain definite thing, the servant's discretion was limited.

The second paragraph of the syllabus, in the case of *Mitchell* v. *Crasswellar*, 13 C. B., 237, *supra*, which is cited by counsel for defendant, is as follows:

"The defendant's car man having finished the business of the defendant, returned to their shops in Wellbeck street, with the horse and cart, and obtained a key to the stable, which was close at hand, but instead of going at once and putting up the horse as it was his duty to do, he, without his master's knowledge or consent, drove a fellow workman to Euston Square, and on his way back ran over and injured the plaintiff and his wife. *Held*: That inasmuch as the car man was not at the time of the accident engaged in the business of his masters, they were not responsible for the consequences of his unauthorized act."

It will be noticed in this case too that the car man had finished the business of the day, and it was his duty then to return to the stable with the horse. He went to his home, got the keys of the stable, was about to proceed to the stable in an adjoining street when the defendant's foreman asked him to drive him a part of the way home, which he did. On page 240, the court, in referring to the well-known case of *Joel* v. *Morrison*, 6 C. & P., 501, where it was held, that if the servant, being on the master's business, took a detour to call upon a friend, the master will be held responsible, further says:

"If he, the servant, was going out of his way against the master's implied commands, when driving on his master's business, he will make his master liable; but if he was going on a frolic of his own, without being out on his master's business the master will not be liable."

The court also referred to the case of *Sleath* v. *Wilson*, 9 C. & P., 607, in which Erskine, J., said:

"I think the law has been most properly laid down by Mr. Baron Parke in the case which has been cited. It is quite clear that if a servant, without his master's knowledge, takes his master's carriage out of the carriage house, and with it does injury, the master is not answerable; and on this ground, that the master has not entrusted the servant with the control of the carriage, it is no answer that the servant acted improperly in the management of it."

The master in such case would be liable, and the ground is, that he has put it in the servant's power to mismanage the carriage by entrusting him with it. The court further say:

"No doubt the master may be liable for injury done by his servant's negligence, where the servant, being about his master's business, makes a small deviation, or even where he so exceeds his duty as to justify his master in at once discharging him. But here it can not be denied that, though it was the duty of the car man, on his arrival with the horse and cart at Wellbeck street, merely to take them to the stable, he, in violation of that duty, without the sanction and knowledge of his employers, instead of going to the stable, started on a new journey wholly unconnected with his master's business."

And as bearing upon the case now before us, it was further said by Jervis, C. J., page 245:

"I think, at all events, if the master is liable where the servant has deviated, it must be where the deviation occurs on a journey on which the servant has originally started on his master's business."

I can not understand how counsel for defendant can find in the doctrine of this case warrant for their contention. Maule, J., said he was of the same opinion as Jervis, C. J., and further, on page 240, said:

"That brings us to the real question. The facts were these: The defendant's car man having finished his business, had nothing further to do but drive the horse to the stable. At the time of the accident he was not going a round-about way to the stable, or, as one of the cases expresses it, making a detour. He was not engaged in the business of his employer."

The reason for the case is, that having finished his business he was no longer in the service of his master. His time was his own; and it could not be said that in doing the act which resulted in the injury he was in the scope of an employment that really did not exist.

The defendant's counsel might have cited *Laugher* v. *Pointer*, 5 B. & C., 547, where the plaintiff's horse was injured, it appearing the defendant owned the carriage but applied to a job man who supplied him with a pair of job horses and a coachman for the defendant. The coachman, it appears, under some custom, was not paid any salary or wages by the job man, but whatever compensation he received was by way of gratuities from the customer of the job man. It was held that the coachman, so hired by the job man, was not the servant of the defendant, for the reason that he was not hired by the defendant. The defendant had no power to dismiss him, and paid him no wages. The coachman, it is said, "was only to drive the horses of the job man"; he, however, paid him no wages, "and the whole which he got was from the person who hired the horses"; but this was only a gratuity, and because it was optional to give him a gratuity or not, it was held that the driver was not the defendant's servant. This subtlety of reasoning was too refined and attenuated to stand the acid test of legal exegesis, and in *Brady* v. *Giles*, 1 Moo. & R., 495, "Lord Abinger, C. B.,    *    *    * said it had always appeared to him that the Court of King's Bench had pursued an erroneous course in *Laugher* v. *Pointer*, when they allowed the question now raised to be discussed as if it were a question of law for the judge to decide. It always appeared to him that it was quite impossible to lay down any rule of law on such a point. No satisfactory line could be drawn at which, as a matter of law, the general owner of a carriage, or rather the general employer of a driver, ceased to be responsible and the temporary hirer became so. Each case of this class must depend upon its own circumstances; and the jury, taking the circumstances of the present case into consideration, must undertake the task of deciding."

In a late Ohio case, *White Oak Coal Company* v. *Rivoux* (15 C.C. [N.S.], 143), it was held that the facts that the automobile

was owned by the defendant and was negligently operated by an employee, does not make a *prima facie* case of negligence against the owner, unless it appears that the employee was driving the automobile with authority, express or implied, of the owner.

In this case it appeared that the bookkeeper or cashier of the defendant used the automobile on the day of the accident on personal business, and that while so using the car the injury to plaintiff occurred. It was claimed by plaintiff in this case that when it appeared that the driver of the automobile was a servant of the defendant, and was driving the defendant's car, a *prima facie* case arose. The Supreme Court held, however, that this was not sufficient, and that, as was held in the syllabus, it must also appear he was driving the automobile with authority, either express or implied, of the owner. The court, in commenting upon the cases cited, uses this significant language:

"We find that in these cases (where) at the time of the accident the automobile was in charge of a servant of the owner—a chauffeur in most instances—whose duty it was to operate the automobile, and he was rightly in possession and use of the same with the consent, and knowledge, and authority of the owner, the courts have held that the establishment of these facts raises the presumption or inference that the person so in charge was acting within the scope of his employment, and then it becomes a question for the jury to determine, upon all of the evidence in the case, whether or not this presumption has been overcome."

Coming now to the cases cited by counsel for plaintiff, we first find the case of *Joel* v. *Morrison*, 6 C. & P., 501, decided in 1834. The driver was on the master's business, but made a detour to call on a friend. Baron Parke said:

"There is no doubt that the driver of the cart is guilty of negligence, and there is no doubt also that the master, if the person was driving the cart on his master's business, is responsible. * * * If the servant was going out of his way against his master's implied commands when driving on his master's business, he will make his master liable; but if he was going on a frolic of his own, without being at all on his master's business, the master will not be liable."

We here first meet with the phrase "on a frolic of his own," which has come down through all the cases ever since it was used by this learned judge.

Taking the doctrine of this case, can it be said that Pelrein was not at all on his master's business when he drove back on Payne avenue    It must be conceded that he never ceased to be on that business.  It would be straining the law in favor of the master to say that he was not on the master's business; and it can not be said in any view of the case that Pelrein, when he drove back on Payne avenue, was on a frolic of his own, or any kind of a frolic.

We think of the case of *Sleath* v. *Wilson*, 9 C. & P., 607, states the law distinctly and correctly.  In that case the servant had his master's horse and carriage in his possession, and was directed to take them to a certain place, but instead of doing so he went in another direction and delivered a parcel of his own, and ran or drove against an old woman and injured her.  The master was held liable for the act of the servant, although at the time he committed the offense he was acting in disregard of his master's orders, for the reason that the master had entrusted the carriage to the control and care of the servant, and in driving it he was acting in the course of his employment.  This is perhaps carrying the doctrine further than the courts seem willing to go, and in a later English case the doctrine was somewhat modified.  But in the case of *Philadelphia & Reading Railroad Company* v. *Derby. supra,* decided by the Supreme Court of the United States, the doctrine of *Sleath* v. *Wilson* is approved in these words, page 486:

"The case of *Sleath* v. *Wilson*, 9 C. & P., 607, states the law in such cases distinctly and correctly."

And Mr. Justice Grier states the facts in the *Sleath* v. *Wilson* case, and the language used by Mr. Justice Erskine, with approval and adopts the doctrine of the case as the law.  Mr. Justice Grier further says (487):

"The entrusting of such a powerful and dangerous engine as a locomotive to one who will not submit to control and render im-

plicit obedience to orders is itself an act of negligence, *causa causans* of the mischief.''

In the case just cited the president of one railroad was invited by the officers of another to inspect its road, and at the time of the injury they were riding in a small locomotive. Orders had been given to keep the track clear. One servant of the defendant disobeyed the order, and the collision and injury were the result. This called for the expression of Mr. Justice Grier just quoted.

Counsel for plaintiff relies mostly upon the case of *Ritchie* v. *Waller*, 63 Conn., 155. This is a leading case, but there is a more and very recent expression relating to an automobile case which is more in point than the cases relied upon by plaintiff. Reference will be made to this case.

In *Ritchie* v. *Waller*, the servant, while driving his master's cart or wagon, disregarded the instructions of the master. On page 159 the court say:

''Instead of returning to Main street through the lane or Grand or Commercial street, and going thence northerly towards Trumbull as usual, Blackwell drove southerly down the avenue to Bull's Head, and thence into Main street, and thence northerly in the direction of home till he came to a certain shoemaker's shop.''

There he got off, leaving the team unhitched, and went into the shop. His purpose and object in so doing was to see the shoemaker about soleing or mending his own shoes. While he was in the shoemaker's shop the team ran away, and injury to the plaintiff resulted. In this case the court holds that the intent of the servant was important, and in the construction of the rule this intent should prevail. On page 161 the court say:

''In by far the greater number of cases where the question of the master's responsibility turns, as in the present case, principally upon the mere extent of deviation by the servant from the strict course of his employment or duty, it has been generally held to be one of fact and not of law. In such cases it is, and must usually remain, a question depending upon the degree

of deviation and all the attendant circumstances. In cases where the deviation is slight and not unusual, the court may, and often will, as matter of law, determine that the servant was still executing his master's business. So, too, where the deviation is very marked and unusual, the court in like manner may determine that the servant was not on the master's business at all, but on his own. Cases falling between these extremes will be regarded as involving merely a question of fact, to be left to the jury or other trier of such questions."

Practically all of the leading cases decided before that time are commented upon in this case. Mr. Justice Grier, in *Philadelphia & Reading Railroad Company* v. *Derby, supra,* said, page 486:

"There may be found, in some of the numerous cases reported on this subject, dicta which, when severed from the context, might seem to countenance the doctrine that the master is not liable if the act of his servant was in disobedience of his orders. But a more careful examination will show that they depended on the question, whether the servant, at the time he did the act complained of, was acting in the course of his employment, or in other words, whether he was or was not at the time in the relation of servant to the defendant."

We have here as explicit a definition of what is meant by "course of employment" as it is perhaps possible to obtain. If the servant, at the time he committed the act complained of, was in relation of servant to the master, he is acting in the course of his employment, and it must be conceded that when the servant is entrusted with the service, the relation continues until it can be said the service has been fully performed or wholly abandoned.

"This question is simply whether the wrong inflicted was incidental to the discharge of the servant's functions. It may have been capricious. It may have contravened the master's purposes or directions. But a master who puts in action a train of servants, subject to all the ordinary defects of human nature, can no more escape liability for injury caused by such defects, than can a master who puts machinery in motion escape liability, on the ground of good intentions, for injuries accruing from defects of machinery. Out of the servant's orbit, when he ceases to be a servant, his negligences are not imputable to

the master. But within that orbit, they are so imputable, whatever the master may have meant." *Wharton on Negligence,* Section 160.

The case of *Patten* v. *Rea,* C. B. (N. S., 2), page 606, decided in 1857, contains some interesting doctrine. The driver in this case owned a horse and gig which was used in connection with the defendant's business. He was general manager of the defendant, and the horse and gig were kept upon the defendant's premises free of charge. Upon one occasion the driver and owner of the horse and gig used the same in making a call upon his physician. He said to defendant, however, that before he returned he would call upon one Smith and collect a bill which Smith owed the defendant. While he was on the way to see his physician the injury occurred. It was held the defendant was responsible, and that it was immaterial that the driver was also going on private business of his own. During the trial the learned judge put certain inquiries to the jury, and in response thereto the jury found that there was no verbal request by the defendant to the driver to take the horse and gig upon the defendant's business. Because of this answer to the interrogatory, the counsel for defendant obtained a rule nisi for a new trial, on the ground of misdirection on the part of the learned judge in not referring to the jury the question whether the horse and gig driven by the driver were used by him on his master's business at the instance and *express* request of the defendant. The question for review before the Queen's Bench was, whether this rule should be granted. Williams, J., said:

"The complaint is that my brother Cawder misdirected the jury in not leaving to them the question whether the horse and gig driven by Taylor were used by him on his master's business at the instance and express request of the defendant. Now it clearly is not necessary, in cases of this sort, that there should be any express request. The jury may imply a request or assent from the general nature of the servant's duty and employment."

*Story* v. *Ashton,* Q. B., 4 Law Reports, 476. It appears that defendant was a wine merchant, and sent his servant with a horse and cart to deliver some wine and bring back the empty

bottles.   On the return trip, instead of going to the defendant's place of business, the driver went in a different direction, at the request of another servant of the defendant, and on an errand for that other servant.   In this case it was held that the defendant was not liable.   It appears that when the servant went upon a mission for the other clerk, and on business personal to the other clerk, it was after business hours, and the servant was acting on his own time.   In this case Cockburn, C. J., said:

"While I can not adopt the view of Erskine, J., in *Sleath* v. *Wilson, supra,* that it is because the master has entrusted the servant with the control of the horse and cart that the master is responsible, yet he was very far from saying, if the servant, when going on his master's business, took a somewhat longer route, that owing to the deviation he would cease to be in the employment of the master so far as to divest the latter of all liability.   In such cases it is a question of degree as to how far the deviation could be considered a separate journey.   If it is a question of degree or length of the deviation measured by time and distance, it becomes a question of fact properly left to the jury."

In the case just cited the extra distance driven by the servant was three or four miles, and perhaps consumed one or two hours.   If this was a question of degree, or if such deviation could be said to be a question of degree as to the amount of deviation, and it should be left to the jury, how could it be said that going back a mile on Payne avenue, which at best would occupy not to exceed ten minutes, is not also a question of degree which should have been left to the jury.

In *Cunningham* v. *Castle*, 145 N. Y. Supp., 1057, it appeared that the servant borrowed the master's automobile and was using it for his own pleasure.   It was held that:

"Whether the servant was acting within the scope of his authority, so as to render the defendant liable for his negligence, should have been submitted to the jury."

The question here turned upon the fact whether permission to use the car had or had not been given.   In this case the court used this very emphatic and significant language (page 1063):

"It may be that it would be wise and in the public interest that responsibility for an accident caused by an automobile

should be affixed to the owner thereof, irrespective of the person driving it, but the law does not so provide.''

Of course it is the province of courts to declare the law as they find it to be; but if it would be wise to fix responsibility upon the owner of an automobile, irrespective of who drives it, the courts will not strain a point or strain the rule of law to relieve the master where there is any doubt as to whether the servant, at the time of the injury complained of, was acting within the scope of his employment.

A very interesting case is that of *Sina* v. *Carlson,* 139 N. W., 601. In this case the driver of the wagon lived some miles in the country at the master's country home. On the day that the plaintiff was injured, winter being at hand, the servant desired to go to town to get overshoes and rubbers for himself, wife and child; and as an excuse for using the master's team, he took some of the furniture belonging to the master, located at the country home, to the master's city home. He was not authorized to do this, and in fact had been instructed not to do it, and the master had sent another team from the city to the country home for this furniture. It was held the defendant was liable. In the opinion, page 602, the court say, in speaking of the servant:

''Whether he was in fact acting within the scope of his agency, was fairly a question of fact for the jury. Olson, the driver, was in appellant's employ and driving appellant's team. He was admittedly acting, in part at least, in furtherance of the master's business, and not altogether for purposes personal to himself.''

On this question, aside from being a question of fact for the jury, the court held that, even if the servant made a trip solely to make purchases for himself and family, and without the authority of the master or even in violation of orders, the defendant would notwithstanding be liable, for the reason that he was, in part at least, acting for the master and for the further reason that it appeared in evidence that the servant had repeatedly driven the master's team for purposes personal to himself.

In *Ewald* v. *C. & N. W. R. R. Co.,* 79 Wis., 428, in commenting upon the use which servants make of their master's cars to do errands of their own, the court say that the car may be said to

be a ''means and facility and advantage to which he was entitled by reason of his being an employee or servant, which entered into and became a part of the contract of employment, or merely incident and necessary to it.

That owners of automobiles know that their chauffeurs do these things is a matter of common knowledge, and they will be held to have impliedly assented to such use of the automobile. This rule has frequently been applied to cases where railway employees have been permitted to use an engine in going to and from meals. *St. L. Conn. Ry. Co.* v. *Reames,* 173 Ill., 582; *Reilley* v. *H. & St. J. Ry. Co.,* 94 Mo., 600; 146 Wis., 49.

The court said in *Sina* v. *Carlson, supra,* at page 603:

''The rule is, that if within the course .of his employment an employee is permitted to use his employer's vehicle to facilitate the performance of necessary errands of his own, he is still an employee, while so doing, and the principle of *respondeat superior applies.*''

The case of *Quinn* v. *Power,* 87 N. Y., 535, is a case in point. The defendant was the owner of a ferry boat, running across the Hudson river between H. and A. While the boat was making its regular trip from A. to H. the pilot in charge took on at A. a boatman, agreeing without compensation to put him on board his boat, which was part of a tow passing up the river. The ferry boat was diverted from its course to reach the tow, and through the negligence of those in charge collided with a canal boat on which the plaintiff's intestate was at the time. The force of the collision threw the plaintiff's intestate into the river, and he was drowned. In an action to recover damages for the death, *held*: That those in charge of the ferry boat were at the time of the accident engaged in defendant's business, and he was responsible for their negligent acts.

This must proceed wholly upon the theory that when the boat started from A. to H. it had not completed its journey at the time of the accident; it was still engaged in the master's business; and the mere fact that a detour was made, and that the pilot in charge of the boat acted contrary to the defendant's orders, and did a thing which apparently was outside of the scope of his employment, yet inasmuch as the decedent's death was caused by the

negligence of the defendant's servants while the ferry was still on its journey, the defendant was held liable.

On page 539 of the opinion the court say:

"In deviating from it, that is, the regular course, the servants might disregard the instructions of the master, but they were none the less engaged in the master's business of transporting passengers from A. to H. because they did not follow the usual route, or there was another or even a forbidden track. They were still doing the employer's work, though in a manner contrary to his instructions. If they stopped the boat in the middle of the river, they did not cease to be engaged in the master's business. Even if the motive was some purpose of their own, they were still about their usual employment."

If it could be said in this case that by stopping the boat in the middle of the river, the servants of the defendant did not cease to be in the master's business, how long might they stop in the middle of the river? Would it not be a question of degree? And if so, would that not be a question for the jury?

In summing up the case the court, on page 540 of the opinion, say this:

"All the authorities, however, agree in the one important respect—that a violation of the master's instructions or a detour from the strict line of duty due to him by the servants, does not necessarily make the latter alone liable."

The court further say:

"These cases" (that is, referring to the authorities) "are useful to illustrate the idea that there may be a deviation from the servant's duty of employment, and that, too, for some purpose or from some motive of his own, without his ceasing to be an actor within the scope of his employment, and in the range of his master's business."

In the case of *Mitchell* v. *Crasswellar*, 13 C. B., 235, *supra*, a part of the first paragraph of the syllabus reads as follows:

"A master is responsible for an injury resulting from the negligence of a servant while driving his cart or carriage in his master's business, even though the accident happens in a place to which his master's business did not call him. But if the journey

upon which the servant starts is *solely* for his own purposes, and undertaken *without the knowledge or consent* of his master, the latter is not responsible.''

In our opinion, the case that is most directly in point and notes the trend of judicial opinion towards a more liberal construction of the rule holding masters liable for misconduct of their servants or enlarging the scope of the meaning of what is meant by ''in the course of employment,'' will be found in the case of *Whimster* v. *Holmes,* 164 S. W., 236, decided February 16, 1914, by the Kansas City Court of Appeals, where it was held in the syllabus that:

''Whether a chauffeur, who was using a car in disobedience of the directions of his employer, and became intoxicated and ran over a man, was acting within the scope of his employment, held under the evidence for the jury.''

It appears in this case that at 1:30 P. M. of July 10, 1910, the defendant's chauffeur drove him to the railway station, he intending to be absent from the city several days. Defendant testified that before he boarded the train he directed his chauffeur to take two friends up into the business part of the city, and then take the car home and put it in the garage. It was further shown that the chauffeur was to overhaul the car and make some repairs during the absence of the defendant, consulting with an expert in a certain public garage in the city for that purpose. It was shown that the chauffeur was at various places from 1:30 until 7:30 P. M. during a period of six hours, before he ran over the plaintiff. The chauffeur testified that after he had left the defendant's friends at their destination he went to an office of which the defendant was an officer and waited for his pay check until 3:30 P. M. He then went two more blocks to a laundry office for his collars. He then drove by a saloon on his way to 34th and Broadway, a distance of about thirty blocks, for the purpose of getting the advice of the expert, Rogers, concerning the overhauling of the machine; that Rogers and he drove the machine some distance to determine what repairs were needed; that he returned Rogers to the garage and then went to his own home for supper. After supper he went back to the public

garage and took the expert, Rogers, home. It was then near 7
⌄ clock. He then started for the defendant's home to put the car
away. When he got near the defendant's home he found he
missed his keys, and not knowing where he had left them or lost
them, he went back to the garage to look for them; and that fur-
ther than that he could not remember. The expert testified that
the chauffeur got a drink of liquor at Westport on their first
drive, and at another place when he was being taken home. The
evidence tended to show that bottles of liquor were found in the
machine, and that other persons, women and men, were seen in
it; and for this reason the defendant claims the chauffeur was
bound on his own pleasure, joy-riding. The court, on page 237,
say:

"If he had gone directly home, and on the way had carelessly
run over a pedestrian, no serious question could have been raised
as to the course of his employment; but because there was delay
in his reaching home, and because he went to other places and
stopped on the way and took drinks of liquor, it is said in effect
his course of employment ceased. That is little short of a state-
ment that so long as an employee keeps within the orders of his
employment he is in the line of his employment, but as soon as he
violates an order he is out of it. That would come near meaning
that no liability would be incurred by an employer for the wrong
of his servant unless he orders him to commit the wrong. It was
a part of the chauffeur's service to take the machine home; and
that he was slow about it, or went in indirect ways, does not alter
the matter, so long as he was in pursuit of that object. * * *
That he had nearly reached home when he turned back to find
his keys, and it was after turning back that he ran over the
plaintiff; but that circumstance did not throw him out of the
scope of his employment. If he lost his keys, it was his duty to
go back and get them."

But surely we might say right here that the defendant was in
no way responsible for the chauffeur losing his keys; and when
he went back to get them, was he not in the pursuit of his own
personal matters? The court further say:

"If an employer puts his chauffeur at the wheel of an auto-
mobile and starts him out, he is responsible for what that serv-
ant does in the way of negligence in running it for the purpose
directed. It is no excuse for the employer to say that 'he became

intoxicated, and I ordered him to keep sober;' or that 'he drove too fast, and I directed him to go slowly;' or that 'he went an indirect way, and I required that he go directly,' provided, of course, he is engaged in the accomplishment of the service he set out to perform.''

In the case at bar, defendant's chauffeur, Pelrein, was engaged in the service of going from his employer's home on Shaker Heights to the Perry-Payne Building to take the defendant home. That was the purpose for which he started out; this was the controlling motive; and in all that he did he was governed by that controlling motive. And the mere fact that he turned back on Payne avenue a distance of a mile, which would in no event cause a delay of over ten minutes, does not take him out of the scope of his service, as he was still governed by the controlling motive to the Perry-Payne Building and take his employer home. The court further say:

''We recognize it as law that the owner of a machine would not be liable for the chauffeur's conduct if the latter took the machine, without the owner's knowledge, and went on a frolic of his own, alone or with others. Nor are we unmindful that a servant may start in a matter as a servant of an employer, and then abandon the service''—in which case there would be no liability; but, as the court say, ''There was evidence tending to show that there was no abandonment of the service by the chauffeur in this case until after the plaintiff's injury. His double effort to consult with Rogers, the expert, and to get the car home, was continuous, so far as was shown, unless it would be when he was taking Rogers home. And allowing that it ceased then, it was undoubtedly resumed, so far as getting the car home was concerned, when he left Rogers.''

And so too in the case at bar. If it can be held that Pelrein's course was not continuous, and allowing that it ceased when he started back on Payne avenue, it undoubtedly was resumed again, so far as getting the car to the Perry-Payne Building and taking his employer home.

We have been at some pains in the examination and citation of these authorities and in commenting upon them, for the reason that there is no case decided in Ohio where the facts are precisely the same as in the case at bar.

We hold, as trier of the facts, that Stephen Pelrein, at the time the plaintiff was injured, was within the scope of his employment as the servant of his master, the defendant, and that he was grossly and palpably negligent in causing the plaintiff's injury. Therefore, judgment will be entered against the defendant in accordance with the stipulation of counsel.